**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NEWELL OPERATING COMPANY, | ) | |
| | ) | |
| Plaintiff and Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | No. 07 C 2996 |
| | ) | |
| VISION INDUSTRIES GROUP, INC., | ) | Judge Hibbler |
| | ) | |
| Defendant and Counterclaim-Plaintiff, | ) | Magistrate Judge Valdez |
| | ) | |
| v. | ) | |
| | ) | |
| STERN & COMPANY, | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |

**VISION'S STATEMENT OF UNDISPUTED FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Raymond N. Nimrod
Jonathan Hill
Emily C. Johnson
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, Illinois 60610
(312) 222-9350
Counsel for
VISION INDUSTRIES GROUP, INC.

## TABLE OF ABBREVIATIONS

'291 Patent          U.S. Patent Nos. 5,139,291

MEC                  MEC Technologies, Inc.

*MEC* case           *Ashland Products, Inc v. MEC Technologies, Inc*., Civil Action No. 96 C
                     4436 (N.D.Ill., Coar, J.)

*MEC* Court          United States District Court for the Northern District of Illinois presiding
                     over *Ashland Products, Inc v. MEC Technologies, Inc*., Civil Action No. 96
                     C 4436

*MEC* Opinion or     Memorandum Opinion and Order (dated Mar. 22, 1999), *Ashland Products,*
*MEC* Op..           *Inc v. MEC Technologies, Inc*., Civil Action No. 96 C 4436 (N.D.Ill., Coar,
                     J.)

Newell               Newell Operating Company

Ro-Mai               Ro-Mai Industries, Inc.

*Ro-Mai* case        *Ashland Products, Inc v. Ro-Mai Industries, Inc*., Civil Action No. 97 C
                     5332 (N.D.Ill.)

*Ro-Mai* Court       United States District Court for the Northern District of Illinois presiding
                     over *Ashland Products, Inc v. Ro-Mai Industries, Inc*., Civil Action No. 97 C
                     5332

*Ro-Mai* Opinion     Memorandum Opinion and Order (dated Aug. 17, 1999), *Ashland Products,*
or *Ro-Mai* Op.      *Inc v. Ro-Mai Industries, Inc*., Civil Action No. 97 C 5332 (N.D.Ill.,
                     Schenkier, Magistrate J.)

Ro-Mai Prior Art     Prior art latch referenced by the '291 patent in Figure 5 and column 1, lines
                     51-66

SUF                  Statement of Undisputed Facts

Vision               Vision Industries Group, Inc.

Pursuant to Local Rule 56.1, Vision herein provides its Statement of Undisputed Facts in Support of Its Motion for Summary Judgment.

## I.    Description of the Parties

1.    Newell is a Delaware corporation that, through its business entity Ashland Hardware Systems ("Ashland"), is engaged, *inter alia*, in the business of selling tilt latches.  (Ex. 26, First Amended Complaint, at ¶2).

2.    Vision is a New Jersey corporation that is engaged, *inter alia*, in the business of selling tilt latches, which business activities include, advertising and selling tilt latches in the Northern District of Illinois.  (Ex. 26, First Amended Complaint, at ¶3).

## II.    Facts Supporting Jurisdiction and Venue

3.    Personal jurisdiction over Vision is proper in view of the Vision's business activities, which include advertising and selling tilt latches in the Northern District of Illinois.  (Ex. 26, First Amended Complaint, at ¶¶3, 5).

4.    With respect to the patent infringement counts, subject matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1332 and/or 1338(a), and with respect the breach of contract count, subject matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1367.  (Ex. 26, First Amended Complaint, at ¶4).

5.    Venus lies in this Court pursuant to 28 U.S.C. §§ 1391 and 1400(b).  (Ex. 26, First Amended Complaint, at ¶6).

## III.    U.S. Patent No. 5,139,291

6.    U.S. Patent No. 5,139,291 ("the '291 patent") admits to the existence of a prior art latch sold by Ro-Mai ("Ro-Mai Prior Art") and characterizes the Ro-Mai Prior Art as follows:

Ro-Mai Industries, Inc., of Twinsburg, Ohio, has recently begun selling a flush mounted pivot latch for insertion in a hollow top sash of a sash window, as illustrated in FIG. 5.  A slot is formed in each of the outer ends of the hollow top sash.  The pivot latch has depending sidewalls.  However, because the sidewalls are relatively thin, a pair of bosses 6 are required to provide a sufficiently stable surface to which to heat-stake a base 7.  Flared tabs 8 are provided which extend outwardly from the sidewalls and the rear wall.  The pivot latch is installed in the top sash by pushing it downwardly into the respective top sash slot until the tabs retainingly catch the top sash.  A bump disposed on the base of the pivot latch reduces lateral movement of the pivot latch.  This pivot latch too is difficult to assemble and tends to disengage from the sash.

(Ex. 3, '291 patent at col. 1, lines 51-68).

7.     The Ro-Mai Prior Art can be installed into the top sash by "snapping in" as well as "sliding in."  (Ex. 22, 1997 *MEC Markman* Hr'g Tr., at 50; *but see* Ex. 1, June 17, 2008 Hr'g Tr. at 43) (Newell argues that the Ro-Mai Prior Art "didn't slide in.")).

8.     The '291 patent depicts the Ro-Mai Prior Art in figure 5 thereof as follows:



(Ex. 3, '291 patent, Fig. 5).

9.     The length of flare tab 8 relative to the length of the sidewall of the Ro-Mai Prior Art is at least 10%.  Using the measurements taken from Figure 5 of the '291 patent to obtain relative lengths, the relative length of base 7 (assuming, to be conservative, there to be no arcuate rear wall) measures about 10 cm, while the relative length of side wall flare tab 8 measures about 1.0 cm.  (*See* Ex. 3, '291 patent at Fig. 5).  The ratio of the relative length of side wall flare tab 8

(*i.e.*, about 1.0 cm) to the conservatively estimated relative length of base 7 (*i.e.*, about 10 cm) is about 10%.  (*See id.*).

10.     Newell estimates length of the side wall tabs of the Ro-Mai Prior Art to be 0.375 inches long.  (Ex. 9, *Ro-Mai Markman* Hr'g Tr. at 17).  0.375 inches corresponds to about 1 cm.

11.     The side wall flare tab 8 on the Ro-Mai Prior Art is short relative to the length of its side wall.  (*See* Ex. 9, *Ro-Mai Markman* Hr'g Tr. at 67 (Newell concedes that the length of the Ro-Mai side wall tab is short, *i.e.*, "***clearly*** is not substantially along" the length of the side wall. (emphasis added)).

12.     The side wall flare tab 8 on the Ro-Mai Prior Art is a "short tab."  (*See* Ex. 9, *Ro-Mai Markman* Hr'g Tr. at 67).

13.     The specification of the '291 patent criticizes the Ro-Mai Prior Art, stating that it "***tends to disengage from the sash***" and that the "invention is provided to solve th[is] and other problems."  (Ex. 3, '291 patent at col. 1, ll. 65-68 (emphasis added)).

14.     Claims 1 and 7 of the '291 patent each require a "longitudinal groove adapted to cooperatively receive a respective pair of said header rails."  (Ex. 3, '291 patent at claims 1 & 7).

15.     Figure 2 of the '291 patent depicts the preferred embodiment of claims 1 and 7:



(Ex. 3, '291 patent at Fig. 2).

16.     According to the '291 patent, "[e]ach of the side walls [of the tilt latch], 56, 58, has a side

wall rail 62 which cooperates with a respective one of the housing cover longitudinal edges 52,

54, to form a longitudinal groove 64 adapted to cooperatively receive a respective one of the

header rails 36, 38."  (Ex. 3, '291 patent at col. 3, ll. 64-68).

17.     Side wall rail 62 spans the full length of the side wall.  (Ex. 3, '291 patent at Fig. 2).

18.     The '291 patent purports to be an improvement over the Ro-Mai Prior Art.  (Ex. 3, '291

patent at col. 1, ll. 51-68; *see also* Ex. 2, *Ro-Mai* Op. at 4).

19.     Instead of using a longitudinal groove to interface with the header rails to retain the latch,

the Ro-Mai Prior Art uses "[f]lared tabs 8 … which extend outwardly from the sidewalls and the

rear wall … to retainingly catch the top sash."  (Ex. 3, '291 patent at col. 1, ll. 59-63).

20.     The continuous groove disclosed in Figure 2 of the '291 patent provides maximum strength against bending and disengagement.  (*See* Ex. 2, *Ro-Mai* Op. at 4; Ex. 4, *MEC* Op. at 7-8; Ex. 13, at NWL 2941).

21.     The benefits of the invention covered by claims 1 and 7 cannot be obtained unless the recess wall-forming projections formed on the side wall are at least significantly longer than the flared tabs of the Ro-Mai Prior Art.  (Ex. 2, *Ro-Mai* Op. at 12; Ex. 4, *MEC* Op. at 7).

22.     In marketing materials, Newell touts continuous lengthwise header rail contact as superior to the prior art, stating that its "ribs run the ***full length of the housing length*** for superior security."  (Ex. 13, at NWL 2941 (emphasis added)).

23.     All asserted claims require a "longitudinal groove" that is either formed by a side wall (claim 1) or formed by a side wall rail (claim 7).  (Ex. 3, '291 patent, at claims 1 & 7).

24.     The only potential difference between claim 1 of the '291 patent and the Ro-Mai Prior Art is the length of the side wall projection forming the "longitudinal groove" recited by claim 1, as found by the *Ro-Mai* Court, (Ex. 2 at 4 ("the '291 patent replaces the flared tabs of the prior-[Ro-Mai] art latch with a longitudinal rail on each side wall which … runs the length of the side wall.")), and as is shown below:

| Claim 1 | Where Disclosed in the Ro-Mai Prior Art |
| --- | --- |
| 1. For a pivotal window sash adapted for installation in a master frame of a sash window assembly having opposed, vertically extending guide rails to enable vertical reciprocal sliding movement of said sash window in said master frame while cooperatively engaged with said guide rails, said window having a top sash rail, a base and a pair of stiles cooperatively connected together at adjacent extremities thereof to form a rectangular sash frame, said top sash rail including a pair of opposing header slots, | The Ro-Mai Prior Art latch is adapted for use with a pivotal window sash adapted for installation in a master frame of a sash window assembly having opposed, vertically extending guide rails to enable vertical reciprocal sliding movement of said sash window in said master frame while cooperatively engaged with said guide rails, said window sash having a top sash rail, a base and a pair of stiles cooperatively connected together at adjacent extremities thereof to form a rectangular sash frame, said top sash |

| **Claim 1** | **Where Disclosed in the Ro-Mai Prior Art** |
|---|---|
| each of said header slots having a pair of opposing, longitudinal header rails, a pre-assembled pivot latch adapted for substantially flush installation in one of said header slots for releasably securing said window sash to said master frame to permit pivotal movement of said sash, said latch comprising: | rail including a pair of opposing header slots, each of said header slots having a pair of opposing, longitudinal header rails, a pre-assembled pivot latch adapted for substantially flush installation in one of said header slots for releasably securing said window sash to said master frame to permit pivotal movement of said sash. (*See* Ex. 27, at 4-5; Ex. 3, '291 patent at Fig. 5, col. 1, lines 51-68; Ex. 2, *Ro-Mai* Op. at 3-4.) |
| a housing having an outward end opening; | The Ro-Mai Prior Art latch has a housing and an outward end opening.  (Ex. 27 at 4; *see* Ex. 3, '291 patent at Fig. 5; Ex. 2, *Ro-Mai* Op. at 3-4). |
| a latch bolt disposed within said housing; | The Ro-Mai Prior Art latch has latch bolt disposed within said housing.  (Ex. 27, at 4; *see* Ex. 3, '291 patent at Fig. 5; Ex. 2, *Ro-Mai* Op. at 3-4). |
| means for biasing said latch bolt outwardly through said outward end opening and having a nose portion adapted for engaging a respective one of said guide rails, | The Ro-Mai Prior Art latch has a means for biasing said latch bolt outwardly through said outward end opening.  (*See* Ex. 3, '291 patent at Fig. 5 (showing a spring for biasing the latch bolt); Ex. 2, *Ro-Mai* Op. at 3-4). The latch bolt of the Ro-Mai Prior Art latch has a nose portion adapted for engaging a respective one of said guide rails.  (*See* Ex. 3, '291 patent at Fig. 5; Ex. 2, *Ro-Mai* Op. at 3-4). |
| wherein said housing has a cover and a pair of side walls depending from said cover, | The Ro-Mai Prior Art has a housing cover and a pair of depending side walls.  (Ex. 27, at 4; *see* Ex. 3, '291 patent at Fig. 5, col. 1, lines 55-56; Ex. 2, *Ro-Mai* Op. at 3-4). |
| each of said side walls forming a longitudinal groove adapted to cooperatively receive a respective pair of said header rails, | Newell contends that this limitation is not met by the Ro-Mai Prior Art. |
| said housing further including means for engaging said respective one of said stiles. | The Ro-Mai Prior Art has a bump on the bottom of its housing for engaging on of the stiles.  (Ex. 3, '291 patent at col. 1, ll. 63-65 ("A bump disposed on the base of the pivot |

| Claim 1 | Where Disclosed in the Ro-Mai Prior Art |
|---------|------------------------------------------|
|  | latch reduces lateral movement of the pivot latch."); Ex. 2, *Ro-Mai* Op. at 3-4; Ex. 28, at 4) |

25.     The only potential differences between claim 7 of the '291 patent and the Ro-Mai Prior

Art is the length of the side wall projection forming the "longitudinal groove" recited by claim 7,

as found by the *Ro-Mai* Court, (Ex. 2 at 4 ("the '291 patent replaces the flared tabs of the prior-

[Ro-Mai] art latch with a longitudinal rail on each side wall which … runs the length of the side

wall.")), and as is shown below:

| Claim 7 | Where Disclosed in the Ro-Mai Prior Art |
|---------|------------------------------------------|
| 7. A pivot latch adapted for releasably securing a pivotable sash window to a master frame, said master frame having opposed, vertically extending guide rails, said sash having a hollow top sash rail, a base and a pair of hollow stiles cooperatively connected together at adjacent extremities thereof to form a rectangular sash frame, said top sash rail including a pair of opposing header slots, each of said header slots forming a pair of opposing, longitudinal header rails, said pivot latch comprising: | The Ro-Mai Prior Art latch is a pivot latch adapted for releasably securing a pivotable sash window to a master frame, said master frame having opposed, vertically extending guide rails, said sash having a hollow top sash rail, a base and a pair of hollow stiles cooperatively connected together at adjacent extremities thereof to form a rectangular sash frame, said top sash rail including a pair of opposing header slots, each of said header slots forming a pair of opposing, longitudinal header rails. (*See* Ex. 27, at 4-5; Ex. 3, '291 patent at Fig. 5, col. 1, lines 51-68; Ex. 2, *Ro-Mai* Op. at 3-4). |
| a housing having an outward end opening; | The Ro-Mai Prior Art latch has a housing and an outward end opening. (Ex. 27, at 4; *see* Ex. 3, '291 patent at Fig. 5; Ex. 2, *Ro-Mai* Op. at 3-4). |
| a latch bolt disposed within said housing; | The Ro-Mai Prior Art latch has latch bolt disposed within said housing. (Ex. 27, at 4; *see* Ex. 3, '291 patent at Fig. 5; Ex. 2, *Ro-Mai* Op. at 3-4). |
| means for biasing said latch bolt outwardly through said outward end opening and adapted for engaging a respective one of said guide | The Ro-Mai Prior Art latch has a means for biasing said latch bolt outwardly through said outward end opening. (*See* Ex. 3, '291 patent |

| Claim 7 | Where Disclosed in the Ro-Mai Prior Art |
|---|---|
| rails, | at Fig. 5 (showing a spring for biasing the latch bolt); Ex. 2, *Ro-Mai* Op. at 3-4). |
| | The latch bolt of the Ro-Mai Prior Art latch has a nose portion adapted for engaging a respective one of said guide rails. (*See* Ex. 3, '291 patent at Fig. 5; Ex. 2, *Ro-Mai* Op. at 3-4). |
| wherein said housing has a cover having longitudinal edges and a pair of side walls depending from said cover and disposed inward of said edges, | The Ro-Mai Prior Art has a housing cover with longitudinal edges and a pair of depending side walls. (Ex. 27, at 4; *see* Ex. 3, '291 patent at Fig. 5, col. 1, lines 55-56; Ex. 2, Ro-Mai Op. at 3-4). The side walls are disposed inward of the cover. (*See* Ex. 3, '291 patent at Fig. 5, col. 1, lines 60-63; Ex. 2, *Ro-Mai* Op. at 3-4). |
| each of said side walls having a side wall rail which cooperates with a respective one of said housing cover edges to form a longitudinal groove adapted to cooperatively receive a respective pair of said header rails. | Newell contends that these limitations are not met by the Ro-Mai Prior Art. |

## IV.   Prior Litigation and Markman Rulings Concerning The Patent-In-Suit

### A.   Litigation Against MEC

26.   In the *MEC* case, the following "snap-in" MEC design was accused of infringement:



(Ex. 14, at NWL 5214; Ex. 23 at NWL 5211; *see* Ex. 24).

27.     During claim construction in the *MEC* case, Newell argued that the "longitudinal groove" limitation covered any structure capable of receiving a header rail, claiming that "the important aspect of the patented product is … that the groove is adapted to receive a header rail."  (Ex. 4, *MEC* Op. at 5).

28.     Slide-in versus snap-in is completely irrelevant to the invention claimed in the '291 patent.  (*See* Ex. 22, *MEC Markman* Hr'g Tr. at 49-50).

29.     The claims of the '291 patent cover both slide-in and snap-in latches:

> We do not believe that there's any relevance to sliding versus snapping in.
>
> \*       \*       \*
>
> **So this whole sliding versus snapping in is not relevant.** The term receiving they are using – MEC is using as a verb as in receiving as it is being received.  We believe the proper definition of receives is after it's installed it is now receiving it.  It's holding onto it.  Not sliding versus snapping but after it's installed.

(Ex. 22, *MEC Markman* Hr'g Tr. at 49-50).

30.     Newell also believes that there is nothing in the claims, the file history, or the specification of the '291 patent that requires the method of installing.  (Ex. 22, *MEC Markman* Hr'g Tr. at 13-14).

31.     Newell also believes that the critical thing of its '291 patent claims is <u>after the latch is installed,</u> what structure is holding it into place, not how do you get the latch into place to begin with.  (Ex. 22, *MEC Markman* Hr'g Tr. at 13-14).

32.     The *MEC* Court accepted Newell's argument that the claims of the '291 patent did not exclude snap-in latches, and did not limit the claim to slide-in latches.  (*See* Ex. 4, *MEC* Op. at 9; *but see* Ex. 1, June 17, 2008 Hr'g Tr. at 43 (Newell makes the opposite argument in this case stating:  "That's the whole benefit of the ['291 patent] invention.  ***The invention, it slides in***.") (emphasis added)).

33.     Opposing another one of Newell's arguments, MEC argued "that if the court read the claim as broadly as [Newell] argues it should be read, then the wording of claim 1 would apply to the flare tabs of the prior art Ro-Mai latch and thus make the '291 patent invalid."  (Ex. 4, *MEC* Op. at 5).

34.     The *MEC* Court construed "longitudinal groove" to mean:

> [A] recess formed along the exterior side of each of the side wall which receives a respective one of the opposed header rails along the length of the housing, wherein each of the recesses is defined by two spaced recess walls which cooperate to receive one of the header rails, and each of the recess walls is defined by one or more projections **which extend substantially along the length of the side wall**.

(Ex. 4, *MEC* Op. at 9) (emphasis added).

35.     The benefits of the patented design cannot be gained from a non-continuous wall ***if the walls are not <u>significantly longer</u> than the flare tabs of the prior art Ro-Mai design***.  (Ex. 4, *MEC* Op. at 7 (emphasis added); *accord* Ex. 2, *Ro-Mai* Op. at 12).  The benefits of the patented design cannot be gained from multiple, non-continuous side wall projections ***if the projections are not <u>significantly longer</u> than the flare tabs of the prior art Ro-Mai design***.  (Ex. 4, *MEC* Op. at 7 (emphasis added); *accord* Ex. 2, *Ro-Mai* Op. at 12).

### B.     Litigation Against Ro-Mai

36.     In the *Ro-Mai* case, the following Ro-Mai design was accused of infringement:



(Ex. 15, at NWL 2232; *see* Ex. 16 at NWL 8960 (referencing item 2 as an accused product); Ex. 17 at Attachment A).

37.     During the *Markman* proceedings in the *Ro-Mai* case, Newell argued that the gaps between structural points on the side wall of a latch must be included in assessing whether projections "extend substantially along the length of the side wall."  (Ex. 2, *Ro-Mai* Op. at 6).

38.     The benefit of the "longitudinal groove," as claimed by the '291 patent, relates to improving stability after installation, not improving the method of installation.  (Ex. 22, *MEC Markman* Hr'g Tr. at 13-14).

39.     Newell's argument, as set forth in the above paragraph, would mean that the gap portion (indicated with yellow highlighting) between points 22 and 21 shown on the latch below forms part of the claimed "longitudinal groove":



(Ex. 2, *Ro-Mai* Op. at 9) (highlighting added).

40.     Ro-Mai objected to Newell's "point-to-point" approach, contending instead that "the length of the groove must be measured by adding the aggregate length of each projection, and that gaps between projections on the side walls must be disregarded in making that calculation."  (Ex. 2, *Ro-Mai* Op. at 10).

41.     Newell conceded during the *Markman* hearing in the *Ro-Mai* case that the alleged "groove" of its claims "is limited to the length where there is actually the tab and the cooperating cover."  (Ex. 9, *Ro-Mai Markman* Hr. at 17).

42.     A groove is not created where there is no projection to create the groove.  (Ex. 2, *Ro-Mai* Op. at 12).

43.     The word "groove" in the '291 patent claims refers to a "***long***, narrow channel or depression."  (Ex. 2, *Ro-Mai* Op. at 10, 12).

44.     The word "groove" refers to "a long narrow hollow or channel."  (Ex. 22, MEC *Markman* Hr'g Tr. at 23).

45.     The specification of the '291 patent teaches that the purpose of the groove is to better ***engage*** the header rail after installation and that the longer the groove, the more securely the latch will be retained.  (Ex. 2, *Ro-Mai* Op. at 11 (emphasis added)).

46.     Increased actual physical contact (*i.e.*, engagement) between side wall projections and the header rail improves retention of the latch.  (*See* Ex. 13, at NWL 2941 ("ribs run[ning] the ***full length of the housing length [have] superior security***.") (emphasis added)).

47.     The *Ro-Mai* Court found Newell's "definition [of "longitudinal groove" to be] in direct conflict with the plain and ordinary meaning of the word 'groove' — Figure H [above] simply does not literally present a 'long, narrow channel or depression.'"  (Ex. 2, *Ro-Mai* Op. at 12).

48.     The *Ro-Mai* Court agreed with the *MEC* Court that "longitudinal groove" means, at the very least, "a recess formed along the exterior side of each of the side wall which receives a respective one of the opposed header rails along the length of the housing, wherein each of the recesses is defined by two spaced recess walls which cooperate to receive one of the header rails, and each of the recess walls is defined by one or more projections ***which extend substantially along the length of the side wall***."  (Ex. 2, *Ro-Mai* Op. at 17 (emphasis added)).

49.     The *Ro-Mai* Court agreed with the *MEC* Court that "the benefits of the patented design can be gained from a non-continuous wall, as long as the walls are ***significantly longer than the flared tabs of the prior art Ro-Mai design***."  (Ex. 2, *Ro-Mai* Op. at 12 (emphasis added)).

50.    The *Ro-Mai* Court also held, in addition to the claim construction ruling issued by the *MEC* Court, that "any **gaps between projections shall be disregarded** in determining the length that the projections extend."  (Ex. 2, *Ro-Mai* Op. at 17 (emphasis added)).

51.    With respect to the "side wall" limitation, Newell argued for a construction that did not exclude rear arcuate walls:  "Ashland submits that the side walls 56, 58 are correctly interpreted as a pair of spaced structures which define the interior and the exterior of opposing sides of the housing."  (Ex. 28, Ashland opening *Markman* Br. in *Ro-Mai* case at 9).

52.    Ro-Mai argued that the "definition of 'side walls' must [] specify the ends of the walls to provide a reference for a 'groove' formed by the side walls," (Ex. 31, *Ro-Mai Markman* Br. at 6), that Newell's broad definition might improperly include the arcuate portion at the rear of the structure and that "including the arcuate portion of the wall as a part of the side wall would place the rear retainer of the [Ro-Mai] Prior Art on the side wall." (*Id.* at 7).

53.    During the *Ro-Mai Markman* hearing, Newell conceded that the "side wall" ends where the arcuate rear wall begins.  (Ex. 9, at 13).

54.    The *Ro-Mai* Court held that the side wall "begin[s] at the outward end opening and **end[s] at an arcuate rear wall**" and illustrated with asterisks on the figure below the end point of each sidewall and the beginning point of the accurate rear wall:



(Ex. 2, *Ro-Mai* Op. at 17 (emphasis added)).

55.    The foregoing *Markman* rulings precipitated the end of the *Ro-Mai* case, with the parties

settling shortly after the *Markman* rulings issued.  (*See* Ex. 12, *Ro-Mai* Consent Judgment; Ex.

10, at Ro-Mai License).

**V.    No Vision Product Infringes the '291 Patent or Breaches the Settlement Agreement**

       **A.    Vision Products Accused of Patent Infringement**

56.    Relying on the doctrine of equivalents with respect to the "longitudinal groove"

limitation, Newell accuses the following Vision models of infringing the following claims of the

'291 patent:

| Vision Product (by model no.) | '291 patent claim(s) alleged to be infringed | Production no. of sample | Production no. of schematic |
|---|---|---|---|
| 2640 | 1, 3, 4, 7, 8, 9 | V0181 | V1203 |
| 2680 | 1, 3, 4, 7, 8, 9 | V0100; V0182 | V1197; V1204; V3884 |
| 2681 | 1, 3, 4, 7, 8, 9 | V 0101 | V1205 |
| 2682 | 1, 3, 4, 7, 8, 9 | N/A | V1206 |
| 2683 | 7 | N/A | V1207 |
| 2684 | 1, 3, 4, 7, 8, 9 | N/A | V1208 |
| 2685 | 7 | V0102 | V1209 |
| 2690 | 1, 3, 4, 7, 8, 9 | V0103 | V1210 |
| 2691 | 1, 3, 4, 7, 8, 9 | V0104 | V1211 |
| 2693 | 7 | V0105 | V1212 |
| 2694 | 1, 7 | N/A | V1213 |
| 2698 | 1, 3, 4, 7, 8, 9 | V0106 | V1197; V1214; V3884 |
| 2780 | 1, 3, 4, 7, 8, 9 | V0150 | V1197; V1215; |

| | | | V3884 |
|---|---|---|---|
| 2781 | 1, 7 | N/A | V1216 |
| 2790 | 1, 3, 4, 7, 8, 9 | V0151 | V1217 |
| 2791 | 1, 3, 4, 7, 8, 9 | V0152 | V1218 |
| 2794 | 1, 7 | N/A | V1219 |

(Newell's Supplement Response to Vision's Interrogatory No. 3b (dated March 27, 2008), at 4-6).  Collectively, the products referred to immediately above shall be referred to as "Accused Products."

57.     Newell adopts as its own proposed claim interpretation the claim construction set forth by the *Ro-Mai* Court, namely that:

      (a)    the side wall ends where the arcuate portion of the latch begins, (*compare* Ex. 6, Newell's Responses to Vision's First Set of Interrogatories at Ex. B thereto, p. 4 (defining "side walls" to "end[] at an arcuate rear wall") *with* Ex. 2, *Ro-Mai* Op. at 17 (defining "side walls" to "end[] at an arcuate rear wall"); *see also* Ex. 8, Joint Report of Disputed Claim Terms at 2 ("Newell presently believes that the prior claim construction Rulings of this Court in two prior litigations appear to obviate the need for literal of claim limitations allegedly in dispute.");

      (b)    the longitudinal groove must be formed by projections on the side wall that "extend substantially along the length of the side wall," (*compare* Ex. 6, Newell's Responses to Vision's First Set of Interrogatories at Ex. B thereto, pp. 4-5 (defining "longitudinal groove" to be formed by "one or more projections which extend substantially along the length of the side wall") *with* Ex. 2, *Ro-Mai* Op. at 17 (defining "longitudinal groove" to be formed by "one or more projections which extend substantially along the length of the side wall"); *see also* Ex. 8, Joint Report of Disputed Claim Terms at 2); and

      (c)    gaps between projections must be disregarded.  (*Compare* Ex. 6, Newell's Responses to Vision's First Set of Interrogatories at Ex. B thereto, p. 5 ("any gaps between projections shall be disregarded in determining the length that the projections extend") *with* Ex. 2, *Ro-Mai* Op. at 17 ("any gaps between projections shall be disregarded in determining the length that the projections extend"); *see also* Ex. 8, Joint Report of Disputed Claim Terms at 2).

58.     Newell concedes that the claimed "longitudinal groove" requires that, excluding gaps, the "length of the wall formed by the collective group of projections must be significantly longer than the single flared tab of the Ro-Mai prior art latch" and that they collectively must "extend substantially along the length of the sidewall."  (Ex. 32, Ashland Supplemental *Markman* Br. in Ro-Mai case, at 3).

59.     Newell concedes that the "longitudinal groove" claim element of claims 1 and 7 is not literally found in the Accused Products.  (*See* Ex. 5, Newell's Supplemental Response to Vision's Interrogatory No. 3b, at 4-5 (relying on the doctrine of equivalents with respect to the "longitudinal groove" elements of claims 1 and 7)).

60.     With respect to alleged equivalence to the "longitudinal groove" limitation of claim 1, Newell contends that the Accused Products:

> [H]ave under the doctrine of equivalents sidewalls that form a longitudinal groove adapted to cooperatively receive a respective pair of header rails, as evidenced by at least that pronounced projections extend relative the sidewalls, which facilitates insertion of the product from the side into a header slot, such that a pair of longitudinal grooves cooperatively receives a respective pair of the header rails (shown with blue).  The projection in these Vision products are pronounced, in distinction to some other structure such as small flared tabs capable of assembly by pushing the product into the top sash slot until the tabs retainingly catch the top sash.

(Ex. 5, Newell's Supplemental Response to Vision's Interrogatory No. 3b, at 4-5).

61.     With respect to alleged equivalence to "longitudinal groove" and "side wall rail" limitations of claim 7, Newell contends that the Accused Products:

> [H]ave under the doctrine of equivalents sidewalls that have a side wall rail which cooperates with a respective one of the housing cover edges to form a longitudinal groove adapted to cooperatively receive a respective pair of header rails, as evidenced by at least that pronounced projections extend relative the sidewalls, which facilitate insertion of the product from the side into a header slot, such that a pair of longitudinal grooves cooperatively receives a respective pair of the header rails (shown with dark red).  The projection in these Vision products are pronounced, in distinction to some other structure such as small flared tabs

16

capable of assembly by pushing the product into the top sash slot until the tabs
retainingly catch the top sash.

(Ex. 5, Newell's Supplemental Response to Vision's Interrogatory No. 3b, at 5).

62.     For purposes of evaluating whether the Accused Products meet the "longitudinal groove"

limitation of claims 1 and 7:

>       (a)     the structure of Vision model no. 2680 is materially indistinct from, and
>               representative of, the structure of Vision model nos. 2640, 2681, 2682,
>               2683, 2684, 2685, 2690, 2691, 2693 and 2694, (*compare* V1204 *with*
>               V1203, V1205-13); and
>
>       (b)     the structure of Vision model no. 2780 is materially indistinct from, and
>               representative of, the structure of Vision model nos. 2781, 2790, 2791 and
>               2794, (*compare* V1215 *with* V1216-19);

Collectively, Vision model nos. 2640, 2680, 2681, 2682, 2683, 2684, 2685, 2690, 2691, 2693

and 2694 shall be referred to as "2680-Series Models" and Vision model nos. 2780, 2781, 2790,

2791 and 2794 shall be referred to as "2780-Series Models."

63.     For each and every Accused Product, Newell identifies as structure allegedly equivalent

to the claimed "longitudinal groove" the following elements:  (a) the side wall tab; (b) a portion

of the rear wall tab; (c) the gap between the side wall tab and the rear wall tab; and (d) the gap

between peaks of the undulations of the side wall tab.  (Ex. 5, Newell's Supplemental Response

to Vision's Interrogatory No. 3b, at Ex. A.1. thereto, pp. 1-20, 24-33).

64.     Vision never made or sold products pictured in Newell's Supplemental Response to

Vision's Interrogatory No. 3b, at Ex. A.1. thereto, pp. 21-23.  (*See* Ex. 33, Jan. 22, 2008 Liang

Deposition Tr. at 125:2-128:16, 132:7-133:15).

65.     The 2680-Series models have the following characteristics, as shown in the schematic

provided below:

>       (a)     Sidewall length equal to 2.323 inches;

(b)     Sidewall tab adapted to make header rail contact at two points spaced
        0.157 inch apart in the longitudinal direction, the total length of point
        contact with header rail occurring over a distance in the longitudinal
        direction that is less than 1% the length of the sidewall; and

(c)     Rear wall tab formed from the rear wall spanning a distance of 0.064 inch
        in what Newell labels in a blue box in its supplemental contentions as part
        of the alleged equivalent structure forming the "longitudinal groove," the
        0.064 inch measurement being 2.76% the length of the sidewall.



2680 Series

(Ex. 19).

66.     The 2780-Series models have the following characteristics, as shown in the schematic

provided below:

(a)     Sidewall length equal to 2.323 inches;

(b)     Sidewall tab adapted to make header rail contact at two points spaced
        0.157 inch apart in the longitudinal direction, the total length of point
        contact with header rail occurring over a distance in the longitudinal
        direction that is less than 1% the length of the sidewall; and

(c)     Rear wall tab formed from the rear wall spanning a distance of 0.088 inch
        in what Newell labels in a blue box in its supplemental contentions as part
        of the alleged equivalent structure forming the "longitudinal groove," the
        0.088 inch measurement being 3.79% the length of the sidewall.



(Ex. 19).

67.    Vision model no. 2698 has the following characteristics, as shown in the schematic

provided below:

    (a)    Sidewall length equal to 2.008 inches;

    (b)    Sidewall tab adapted to make header rail contact at two points spaced
0.165 inch apart in the longitudinal direction, the total length of point
contact with header rail occurring over a distance in the longitudinal
direction that is less than 1% the length of the sidewall; and

    (c)    Rear wall tab formed from the rear wall spanning a distance of 0.056 inch
in what Newell labels in a blue box in its supplemental contentions as part
of the alleged equivalent structure forming the "longitudinal groove," in
the longitudinal direction, the 0.056 inch measurement being 2.79% the
length of the sidewall.



19

(Ex. 19).

68.    Upon installation in the top sash, the projections of each Accused Product, in what
Newell labels in a blue box in its supplemental contentions as part of the alleged equivalent
structure forming the "longitudinal groove," make contact with the top sash over a distance that
is less than 5.0% the length of the side wall of each respective product, and which is less than
0.375 inches.  (*See* Ex. 19).

69.    Upon installation in the top sash, the projections of each Accused Product, in what
Newell labels in a blue box in its supplemental contentions as part of the alleged equivalent
structure forming the "longitudinal groove," do ***not*** make contact with the top sash over a
distance that is substantially along the length of the side wall or significantly longer than the
flared tabs of the Ro-Mai Prior Art.  (*See* Ex. 19).

70.    The rear wall tab on each Accused Product is not formed from the side wall.  (*See* Ex.
19).

71.    The longitudinal header rails on the window sash for use with the Accused Products are
two parallel rails that each begin at the edge of the window and end at the beginning of the
arcuate portion of the window sash.  (*See* Ex. 3, '291 patent at Fig. 2, claims 1 & 7).

**B.    Vision Products Accused of Breaching the Settlement Agreement**

72.    In settlement over prior litigation concerning the '291 patent, Newell and Vision entered
into a settlement agreement requiring that Vision refrain from making or selling certain products:

> Vision covenants and agrees not to make, use sell, offer to sell, advertise or
> distribute in the United States, or to import into the United States, a tilt latch
> product ***having a sidewall structure as shown in ATTACHMENT B*** (Prohibited
> Proposed Assemblies) during the term of the this agreement.

(Ex. 11, Settlement Agreement, ¶2 (emphasis added)).

73.     Attachment B of the Settlement Agreement thereto in turn depicts several products which

Vision is prohibited from selling, namely, the "Prohibited Proposed Assemblies":



**ATTACHMENT B**
**PROHIBITED PROPOSED ASSEMBLIES**

Version 1

(Ex. 11, Settlement Agreement at Attachment B).

74.     The sidewall tab of prohibited Version 1, is a five-sided protrusion having an upper

surface with a length of 0.287 inches for supporting the header rail when installed.  Depending

on the length of the sidewall, the sidewall tab of Version 1 measures 12.3% or 14.3% of the side

wall length.  (Ex. 11, Settlement Agreement at Attachment B).

75.     Newell alleges that following Accused Products "fall within the scope of at least

Prohibited Proposed Assembly No. 1":  2680; 2681; 2685; 2690; 2691; 2693; 2698; 2780; 2790;

and 2791.  (Ex. 25, Newell's Response to Vision's Interrogatory No. 13, at 2-3).

76.     Newell contends that the products accused of breaching the Settlement Agreement

because:

> [Such products] have structures that include an outer sidewall surface generally
> positioned along a plane, with a pronounced extending body protruding from the
> planar surface.  The extent to which the extending body protrudes from the planar
> surface, such as may be compared relative to the overhang of the cover, is

> *substantially identical to* that which is shown to be prohibited by the Settlement
> Agreement, including that which is depicted as the prohibited structure shown as
> Prohibited Proposed Assembly 1.  Further, the structure found in the above -
> identified Vision tilt latch products provides the same structural features and
> functional fit as the prohibited designs of the Settlement Agreement.  In addition,
> the above-identified Vision products are *more similar to* the Prohibited Proposed
> Assemblies, as compared to the tilt latch designs depicted as ongoing licensed
> products permitted by the License Agreement….

(Ex. 25, Newell's Response to Vision's Interrogatory No. 13, at 3 (emphasis added)).

77.    Attachment B of the Settlement Agreement presents two views for each Prohibited

Proposed Assembly, including a side (lengthwise) view.  (Ex. 11, Settlement Agreement at

Attachment B).

78.    The side view of each Prohibited Proposed Assembly shows structure that is different

from the structure seen from the side view of the Accused Products.  (*Compare* Ex. 11,

Settlement Agreement at Attachment B *with* Ex. 19).

79.    The side view of each Prohibited Proposed Assembly shows side wall tabs that are five-

sided and which have a flat uppermost surface, and which differ from the side wall tabs of the

Accused Products, which side wall tabs of the Accused Products have two undulations, the peaks

of which are adapted to make header rail contact.  (*Compare* Ex. 11, Settlement Agreement at

Attachment B *with* Ex. 19).

80.    The side view of each Prohibited Proposed Assembly shows side wall tabs adapted to

create header rail contact over a distance of 12.3% or 14.3% of the side wall length, while the

side wall tabs of the Accused Products are adapted to make header rail contact at only two

points, and therefore, provide "recess walls" measuring less than 1% the length of the side wall.

(*Compare* Ex. 11, Settlement Agreement at Attachment B *with* Ex. 19).

Dated:  June 30, 2008                    Respectfully submitted,


                                         _____/s/ Jonathan Hill_____
                                         Raymond N. Nimrod
                                         Jonathan Hill
                                         Emily C. Johnson
                                         JENNER & BLOCK LLP
                                         330 North Wabash Avenue
                                         Chicago, Illinois 60610
                                         (312) 222-9350
                                         Counsel for
                                         VISION INDUSTRIES GROUP, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2008, a true and correct copy of the foregoing

**VISION'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION**

**FOR SUMMARY JUDGMENT** was caused to be served via the Court's ECF filing system

upon the following counsel:

> Bradley F. Rademaker
> Aseet Patel
> BANNER & WITCOFF, LTD.
> 10 South Wacker Drive, Suite 3000
> Chicago, Illinois 60606
> Counsel for Newell Operating Company
>
> Mark D. Roth
> ORUM & ROTH
> 53 W. Jackson Boulevard, Suit 1616
> Chicago, Illinois 60604
> Counsel for Stern & Company

>       /s/ Jonathan Hill
> Jonathan Hill
> One of the Attorneys for
> Defendant and Counterclaim-Plaintiff,
> VISION INDUSTRIES GROUP, INC.