IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **Newell Operating Company,** | ) | No.    07 C 2996 |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim-Defendant, | ) | |
| | ) | The Honorable William J. Hibbler |
| | ) | |
| v. | ) | |
| | ) | |
| **Vision Industries Group, Inc.,** | ) | |
| | ) | |
| Defendant and | ) | |
| Counterclaim-Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **Stern & Company,** | ) | |
| | ) | |
| Counterclaim-Defendant. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Newell Operating Company sued Vision Industries Group, Inc., for patent infringement

and breach of a prior settlement agreement. Vision denies the allegations and moves for

summary judgment. For the reasons set forth below, Vision's motion for summary

judgment is DENIED.

**I.      Factual Background**

Newell Operating Company, through its business entity (Ashland Hardware

Systems), designs, manufacturers and sells products for window assemblies, including tilt

latches.[1]  Vision Industries Group competes with Newell in the window assembly and tilt latch production market.[2]

### The '291 Patent

Newell is the sole owner of U.S. Patent No. 5,139,291 entitled "Flush Mount Tilt Latch For A Sash Window And Method." ("the '291 patent").  The patent discloses a tilt latch that slides into the top sash of a window assembly.  A "tilt latch is used in windows in order to allow a user to unhook the bottom half of a standard window and tilt the window inward." *Ashland Prods. Inc. v. MEC Techs., Inc.*, No. 96-C4436, 1999 U.S. Dist. LEXIS 4087, *3 (N.D. Ill. March 22, 1999).  Figure 2 of the 291 patent is reproduced below.



According to the '291 patent, each side wall of the tilt latch has a rail which cooperates with the edges of the housing cover to form a ***longitudinal groove*** that cooperatively receives the header rails.  ('291 Patent, Col. 3, lns. 64-68)  The longitudinal groove is the empty space directly above the side wall rail (the yellow structure) and below the housing cover.

### The Prior Art

---

[1] Newell Operating Company is a Delaware corporation.
[2] Vision is a New Jersey corporation.

The '291 patent states the inventor—Steven Schultz—developed the tilt latch to improve upon existing prior art, specifically, a latch sold by Ro-Mai Industries of Twinsburg, Ohio. ('291 Patent, Col.1, lns. 67-68). The Ro-Mai Prior Art did not have side wall rail that formed a longitudinal groove. Instead, the Prior Art used flared tabs that extended outwardly from the side and rear walls in order to catch and retain the top sash. ('291 Patent, Col. 1, lns. 59-63) The Prior Art was installed in the top of the window sash by pushing it downwardly and snaping the flare tabs into place. ('291 Patent, Col. 1, lns. 59-63) The '291 patent criticizes the Prior Art as tending to "disengage from the sash." ('291 Patent, Col. 1, lns. 59-63) An example of the prior art is reproduced below; the flared tabs are highlighted in yellow and red.



## The Markman Rulings

The claims in a patent define the scope of the patent holder's monopoly. *AbTox Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997) ("Claim interpretation is the process of giving proper meaning to the claim language. Claim language, after all, defines claim scope."). Thus, it comes as no surprise that the meaning of a claim is often hotly contested; patent holders want broad definitions in order to keep similar products off the shelves, while the accused infringer wants a narrow construction so that it has more room to "invent around" the patent and develop substitute products. To settle these

3

disputes, the parties can request a pre-trial claim construction hearing. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995), aff'd, 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996) ("The patent is a fully integrated written instrument. By statute, the patent must provide a written description of the invention ... It follows, therefore, from the general rule applicable to written instruments that a patent is uniquely suited for having its meaning and scope determined entirely by a court as a matter of law."). Newell's 291 patent has been the subject of two such "*Markman* hearings."

In 1999, Newell sued MEC for patent infringement. The court held a *Markman* hearing to define the parameters of the phrase "longitudinal groove" in Claim 1 of the '291 patent. *Ashland Prods. Inc. v. MEC Techs., Inc.*, No. 96-C4436, 1999 U.S. Dist. LEXIS 4087, *3 (N.D. Ill. March 22, 1999). The disputed language in Claim 1 was:

> " ...[the] said housing has a cover and a pair of side walls depending from said cover, each of said side walls forming a longitudinal groove adapted to cooperatively receive a respective pair of said header rails ...

*MEC*, 1999 U.S. Dist. LEXIS 4087, at *9. The court determined that the groove did not need to be continuous in order to fall within the ambit of the '291 patent:

> Granted, the diagrams included within the preferred embodiment show a continuous edge on the body of the tilt-latch implying that the sidewall, or groove, must be continuous. However, [Newell] is correct that the patent claims should not be limited to the preferred embodiment. Since Claim 1 does not contain any limiting words, such as "continuous," it is broader than the preferred embodiment ... the plain language of the claim does not require a continuous groove.

*Id.* at *10-11. After examining the claim, the specification, and the prosecution history of the '291 patent, the court construed the meaning of a "longitudinal groove adapted to cooperatively receive a respective pair of said header rails" as:

> a recess formed along the exterior side of each of the side walls which receives a respective one of the opposed header rails along the length of the housing, wherein each of the recesses is defined by two spaced recess walls which

4

cooperate to receive one of the header rails, and each of the recess walls is defined by one or more projections which extend substantially along the length of the side wall.

*Id.* at *15.

Newell also accused Ro-Mai Industries of infringing the '291 patent. Once again, the parties needed a *Markman* hearing to resolve a dispute regarding the longitudinal groove. This time, the parties disagreed on two points: (1) what portion of the recess can be considered a "groove"; and (2) how far the projections (rail/flare tabs) had to extend along the side wall. *Ashland Prods. Inc. v. Ro-Mai Indus.*, No. 97-C5332, 1999 U.S. Dist. LEXIS 12944, *15 (N.D. Ill. Aug. 15, 1999). The court began by noting that the "purpose of the groove is to better engage the header rail; the implicit assumption is that the longer the groove, the more securely the latch will be retained." *Id.* at *19. The court agreed with Ro-Mai that, "no groove is created where there is an absence of projections to create a recess with the cover. Put another way, literally speaking, a groove is not created where there is no projection to create the groove." *Id.* Next, the court considered the prior claim construction, which held that the projection "extend substantially along the length of the side wall." The court began by noting, "it is the projections themselves (and not the gaps between them) that literally create the groove." *Id.* at *22 (emphasis added). Although the court refused to place a numerical value on how far the projection/rail/tab that creates the groove needs to extend along the side wall,[3] the court stated, "any gaps between projections shall be disregarded in determining the length that the projections extend." *Id.* at *29.

***Vision's Products***

---

[3] Ro-Mai had argued that the rail/tab needed to run 75 percent of the latch.

5

Newell alleges Vision's products infringe the '291 patent. A representation of Vision's tilt latches is below:



Vision's products have a projection on each side wall that is aligned with the rear wall projection.[4] The projections cooperate with the side wall and top cover to form a "longitudinal groove" that engages the header rails. Newell argues the combination of these structural features—the side wall projection and the rear outward projection—is the functional equivalent of the side wall projection disclosed in the '291 patent. Vision, however, argues that its projections do not run the length of the side wall, and the longitudinal groove only exists at the "peak of each undulation" of the side tabs. Therefore, Vision contends its product is similar to the Ro-Mai prior art and is appreciably different from Newell's tilt latch. Newell, of course, disagrees and has sued Vision for infringement of the '291 patent.

This, however, is not the first time Newell accused Vision of encroaching upon its patent rights. In 2005, Newell sued Vision in the Northern District of Illinois for infringing the '291 patent. The parties entered into a settlement agreement, which Newell now claims Vision has breached.

---

[4] Newell claims two models of tilt latches (2600 series and 2700) infringe the '291 patent. There are inconsequential differences between the two models

## II.     Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor. Fed. R. Civ. P. 56(c). Once the moving party has met the initial burden, the nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment. *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005). The nonmoving party must produce specific facts showing there is a genuine issue of material fact, and the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Finally, all evidence and inferences must be viewed in the light most favorable to the nonmoving party. *Id.* at 255.

## III.     Analysis

### A.     *Non-Literal Infringement—The Doctrine of Equivalents*

Newell acknowledges that its tilt latch is structurally different from Vision's product. Nevertheless, Newell argues Vision's tilt latches have the functional *equivalent* of the claims disclosed in the '291 patent. In other words, Newell argues for infringement under the doctrine of equivalents.

In *Warner-Jenkinson v Hilton Davis Chemical Co.*, the Supreme Court considered the issue of non-literal patent infringement in the context of a dispute between two dye

7

manufacturers. 520 US 17, 137 L Ed 2d 146, 117 S Ct 1040 (1997). The plaintiff's

patented dye filtration process operated at a pH level of 6.0 to 9.0; the defendant's dye

filtration process operated at a pH level of 5.0. *Id.* at 21, 23. Even though the

defendant's filtration process did not fall within the *literal* scope of the patent's language,

the Court held the defendant might be infringing the patent under the doctrine of

equivalents:

> Under this doctrine, a product or process that does not literally infringe upon the
> express terms of a patent claim may nonetheless be found to infringe if there is
> equivalence between the elements of the accused product or process and the
> claimed elements of the patented invention. Petitioner which was found to have
> infringed, upon respondent's patent under the doctrine of equivalents, invites us to
> speak the death of that doctrine. We decline the invitation.

*Id.* at 21. The Court then articulated the test for the doctrine of equivalents: "Does the

accused product or process contain elements identical *or equivalent* to each claimed

element of the patented invention?" *Id.* at 40 (emphasis added).

Five years later, the Court further explained the benefits behind the doctrine of

equivalents:

> The language in the patent claims may not capture every nuance of the invention
> or describe with complete precision the range of its novelty. If patents were
> always interpreted by their literal terms, their value would be greatly diminished.
> Unimportant and insubstantial substitutes for certain elements could defeat the
> patent, and its value to inventors could be destroyed by simple acts of copying.
> For this reason, the clearest rule of patent infringement, literalism, may conserve
> judicial resources but is not necessarily the most efficient rule.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733, 122 S. Ct.

1831, 152 L. Ed. 2d 944 (2002). With these principles in mind, Newell alleges patent

infringement.

According to Newell, Vision's tilt latches contain the functional equivalent of the

claim limitations in the '291 patent. Specifically, Newell argues the projections on the

side and rear walls of Vision's products are the equivalent of the "longitudinal groove" disclosed in claim 1 of the '291 patent. Moreover, Newell claims that Vision's structures perform substantially the same function, in substantially the same way, to obtain substantially the same result as the patented structure. If Vision's allegations are true, it would have a colorable claim for infringement. *See, e.g., Crown Packaging Tech., Inc. v. Rexam Bev. Can Co.*, 2009 U.S. App. LEXIS 5570, *7 (Fed. Cir. March 17, 2009) ("A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product was insubstantial. One way of doing so is by showing on a limitation by limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product.") (internal citations omitted). In response, Vision argues the Court should not bother wading into the factual morass of analyzing the products' functionality. According to Vision, Newell's theory of equivalent infringement would *vitiate* the claim limitations disclosed in the patent, and therefore, there can be no infringement as a matter of law.

**B.      *Claim Vitiation***

The claims in a patent (which are available for public viewing) allow potential inventors to know which territory is off-limits. A patent, after all, is a property right, "and like any property right its boundaries should be clear ... A patent holder should know what he owns, and the public should know what he does not." *Festo*, 535 U.S. at 730-731. Moreover, "if competitors cannot be certain about a patent's extent, they may be deterred from engaging in legitimate manufacture outside its limits." *Id.* at 732. In recognition of these principles, the "all-elements rule" prevents courts from applying the

doctrine of equivalents where doing so would stretch the language of the patent beyond its reasonable application.[5] In other words, courts will not apply the doctrine of equivalents if doing so would cause a limitation to be "read completely out of a claim— *i.e.*, the limitation would be effectively removed or vitiated." *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1017 (Fed Cir. 2006); *Lockheed Martin Corp. v. Space Systems/Loral, Inc.,* 324 F.3d 1308, 1321 (Fed. Cir. 2003) ("[I]f a court determines that a finding of infringement under the doctrine of equivalents 'would entirely vitiate a particular claim element,' then the court should rule that there is no infringement under the doctrine of equivalents." (citation omitted)).

A claim is vitiated if a finding of equivalent infringement would completely erase meaningful functional and structural limitations of the claim. For example, in *Seachange Int'l, Inc. v. C-COR Inc.*, Seachange—an owner of a patent regarding the storage of video data—sued a competitor for infringement. 413 F.3d 1361, 1365 (Fed. Cir. 2005). Seachange's patent had a claim which covered "only those networks in which every processor system is connected to every other processor system via *direct, point-to-point*," connection. *Id.* at 1378. The defendant was using a similar system but with one key difference: the defendant's processing systems utilized *indirect* network connections. Accordingly, the Federal Circuit, held Seachange could not assert a claim under the doctrine of equivalents:

> Seachange's equivalents theory implies that a network in which every processor is connected to every other processor through *indirect* interconnections can be equivalent to a network in which every processor is connected to every other processor by *direct, point-to-point interconnections*. However, equivalents under such a theory *would vitiate the requirement* that every processor be connected to

---

[5] To find infringement under the all-elements rule, the accused device must contain, "each limitation of the claim, either literally *or by an equivalent.*" *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (emphasis added).

every other processor point-to-point, and therefore must fail as a matter of law. *Id.* at 1378.

Another example of claim vitiation occurred in *Asyst Techs. v. Emtrak, Inc.*, 402 F.3d 1188 (Fed. Cir. 2005). The patent at issue described an inventory management system used in the production of integrated circuits. *Id.* at 1190. A central feature of the system was an automated process of pod-tool recognition that ensured "each pod was processed by the right tool at the right time..." *Id.* The claims of the patent depicted a system in which microcomputers were *mounted* on each pod and communicated with microcomputers *mounted* on each processing tool. *Id.* The accused infringer's device, however, was different in that its "cell controller containing the microcomputer that performs that function *need not be affixed* to a processing tool, but can simply be *placed near* a tool or a cluster of tools." *Id.* at 1192. The Federal Circuit affirmed the trial court's finding of non-infringement:

> [T]he district court concluded that the 'mounted on' limitation is binary in nature. That is, the second microcomputer means must be either mounted or unmounted. For purposes of equivalents, the court concluded, 'an unmounted microcomputer means cannot be equivalent to a mounted one.'

> We agree with the district court's conclusion with respect to the claim of infringement under the doctrine of equivalents. *To hold that 'unmounted' is equivalent to 'mounted' would effectively read the "mounted on" limitation out of the patent.* As the district court noted, the "all elements rule" provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation.

*Id.* at 1195.

Like the above cases, Vision asserts that Newell's theory of equivalent infringement would entirely vitiate the claim limitations in the '291 patent. Vision contends the '291 patent requires the side wall projection—and the resultant longitudinal

groove—to extend substantially along the length of the side wall. By contrast, Vision's products have side and rear wall projections that are shorter than the structures depicted in the '291 patent. Therefore, not only are the projections short, but the resultant longitudinal groove—*i.e.*, the space directly above the side wall projection and below the housing cover—is also short. In Vision's own words:

> Newell cannot now use the doctrine of equivalents to argue that projections which are collectively ***short*** are somehow equivalent [to] a 'longitudinal groove' which is a '***long***, narrow channel or depression.' ***Short*** is the opposite of ***long***. The doctrine of equivalents cannot be used to capture something which is the opposite of what the claim requires. As such, Newell's attempt to vitiate the length requirement of the 'longitudinal groove' must fail as a matter of law.

(Vision Mot. for Summary Judgment pg. 20)(emphasis in original).

Thus, Vision likens itself to the defendants in *Asyst* and *Seachange*. Seachange's theory of equivalent infringement would have allowed it to have a legal monopoly over a process (indirect network connections) that was the complete opposite of the process claimed in its patent (direct network connections). The plaintiff in *Asyst* was also barred from claiming a method (unmounted computers) that was the complete antithesis of what was claimed in its patent (mounted computers). Vision argues this infringement issue is also binary in nature, *i.e.*, *short* versus *long*. But, the Court is not convinced that the issues are so cut and dry. First, Vision and Newell's products both have side wall projections that form a longitudinal groove. The size difference between the projections on Vision's latch and the projections on Newell's latch is, at most, a few inches. Vision's tilt latches have a longitudinal groove that is less than inch, while Newell's latch has a longitudinal groove that is around 3 inches. Is this size discrepancy so radically different from the language in the patent that a finding of equivalent infringement would completely erase the claim limitations? The Court finds that the answer is no.

12

A large portion of Vision's argument is based on the court's statements during the two prior Markman hearings. Specifically, Vision relies on the court's finding that the patent requires the longitudinal groove to extend substantially along the length of the side wall. But, in those prior cases, the court was construing the *literal* meaning of the claims. For example, in *Ashland Prods. Inc. v. Ro-Mai Indus.*, the court stated, "no groove is created where there is an absence of projections to create a recess with the cover. Put another way, *literally speaking*, a groove is not created where there is no projection to create the groove." 1999 U.S. Dist. LEXIS 12944, at *15 (emphasis added). The court also found that "it is the projections themselves (and not the gaps between them) that *literally* create the groove." *Id.* at *22 (emphasis added). This case, however, is one for *non-literal* patent infringement.

Vision acknowledges that its latch has a side wall projection that creates a longitudinal groove. Thus, the two products are not polar opposites; the difference is a matter of degree. Differences of this nature are not suited for disposal via summary judgment. For example, in *Ericsson, Inc. v. Harris Corp.*, the plaintiff patented a device that supplied power to a telephone set. 352 F.3d 1369 (Fed. Cir. 2003). The patent stated the device would "*only* supply power" to the telephone set when the *receiver was off its hook*. *Id.* at 1372. By contrast, the allegedly infringing device sometimes supplied power to the telephone set when the *receiver was on its hook*. *Id.* at 1375. Despite these differences, the Federal Circuit held that applying the doctrine of equivalents would not vitiate the claim limitations of the patent:

> [T]he accused devices [supply power] when the phone is on-hook for just four seconds during the caller-ID function ... Such a trivial difference does not vitiate the "only supply power" limitation because, even under the caller-ID scenario, the speech signal amplifiers in the accused devices are very close to only supplying

power to the telephone set when the receiver is in the off-hook position. Thus, the jury reasonably could have found that, even when used with the caller-ID, the accused devices are insubstantially different from the claimed limitation and consequently infringe under the doctrine of equivalents.

*Id.*

This logic was also used in *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841 (Fed. Cir. 2006). In *Primos*, the plaintiff owned a patent for a device used by hunters to simulate animal noises. *Id.* A claim in the patent described a "plate" extending upward over the membrane of the device. *Id.* at 844. The allegedly infringing device had a "dome" extending over the membrane as opposed to a plate. *Id.* The defendant argued: "allowing a 'dome' to be considered an equivalent to a 'plate' would eliminate that limitation form the claim." *Id.* at 850. The Federal Circuit, however, held that substituting a raised dome for a flat plate would not vitiate the limitations of the patent. *Id.*

In *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097 (Fed. Cir. 2002), the plaintiff patented a drug that had a "phospholipids content [of] 68.5 to 90.7%." *Id.* at 1100. The defendant's drug had a phospholipid content between 91 to 94.5%; thus, the phospholipids content was outside the literal scope of the patent. *Id.* 1101. Nonetheless, the plaintiff sued the defendant for infringement, and claimed the defendant's drug functioned in the same way and provided the same result as the patented drug. *Id.* at 1107. The defendant argued that this theory of infringement would completely vitiate the numerical limitation in the patent. *Id.* The Federal Circuit rejected this contention: "Although [the plaintiff's theory of infringement] expands the upper limit beyond the range of literally recited by the claim, it does not eliminate the upper limit altogether."

14

*Id.* The court reiterated, "[t]he fact that a claim recites numeric ranges does not, by itself, preclude [the plaintiff] from relying on the doctrine of equivalents." *Id.*

The above cases demonstrate the inherent difficulty in reconciling the doctrine of equivalents with Congress' desire that a patent holder's monopoly be limited to the claims disclosed in the patent. Here, a simple visual inspection reveals that Vision and Newell are producing different latches. But, Newell submitted an affidavit from the inventor of the '291 patent stating:

> Even though the side wall projections in Vision's tilt latches does not extend substantially along the side wall, the side wall projection cooperates with the rear wall projection to achieve the same function—*i.e.*, to receive the header rail of a window sash—as a longitudinal groove having a side wall projection that does extend substantially along the length of a side wall of a tilt latch...

> Vision has essentially combined two elements—the side wall projection and the rear wall projection—to perform the function of 'one or more side wall projections which extend substantially along the length of the side wall of the tilt latch.'

(Schultz Aff. ¶ 13). Therefore, there is evidence that Vision's tilt latch performs "substantially the same function in substantially the same way with substantially the same result" as the patented product. There is also evidence, however, that the side wall projection on Vision's latch is shorter than the side rail on Newell's latch. The question then is whether a reasonable jury could find that this size difference is insubstantial in light of the evidence that the products have similar functionality. My colleague Judge Guzman previously considered a similar question.

In *Rosby Corp. v. Stoughton Trailers, Inc.*, the plaintiff held a patent over a method of trailer construction. No. 95-C0511, 2003 U.S. Dist. LEXIS 17034, *5 (N.D. Ill. Sept. 26, 2003). A claim in the patent specified that the side panels of the trailer must "be in physical contact" *i.e.*, touching, along the entire length of the trailer. *Id.* at *6-7.

15

The allegedly infringing product, however, had a gap between the side panels. *Id.* at *7.
The defendant argued "panels that ***do not touch***" is the opposite of panels that "***do touch***;" therefore, the plaintiff's theory of equivalent infringement vitiates the "physical contact requirement" from the patent. *Id.* at 20. The court, however, disagreed with the defendant's logic.

The court began its analysis by noting that the gap between the panels in the defendant's trailer was less than an inch. *Id.* at 13. Next, the court found that both the patented and the accused trailers "employ side walls that are aligned side-by-side," and that "[The Plaintiff] has introduced sufficient evidence that the difference between touching and barely not touching is, functionally, minimal." *Id.* at *21. In the court's view:

> While the terms 'contiguously abutting' are surely limitations for literal infringement of the '017 patent, a fair reading of the claim as a whole shows that requiring only side-by-side alignment of side walls for infringement under the doctrine of equivalents does not entirely eviscerate a particular claim element. Rather, finding the claim element here to be side walls in side-by-side alignment strikes the appropriate balance, giving the public fair notice of the patent's reach while simultaneously avoiding the strict literalism the doctrine of equivalents was designed to prevent.
>
> To require the accused product to have 'contiguous abutting' side walls for infringement under the doctrine of equivalents would improperly allow the all-elements rule to swallow the doctrine of equivalents.

*Id.* The Court finds this reasoning to be persuasive. Vision hammers home the point that the projections on its latch are shorter than the projections on Newell's latch. But every product accused of infringement under the doctrine of equivalents is structurally different from the patent at issue. If the doctrine of equivalents did not exist, free riding manufacturers could avoid research and innovation costs—while reaping all the financial

16

rewards—by selling devices that have insubstantial structural changes, but nevertheless function in the same way and achieve the same result as the patented device.

It should be noted:

> A holding that the doctrine of equivalents cannot be applied to an accused device because it vitiates a claim is nothing more than a conclusion that the evidence is such that *no reasonable jury* could conclude that an element of an accused device is equivalent to an element called for in the claim.

*Depuy Spine*, 469 F.3d at1018-1019. Here, Newell has presented evidence that Vision's structural changes do not change the efficacy of the product, and the shortened side wall projection is just another way of forming the patented "longitudinal groove adapted to cooperatively receive a respective pair of said header rails." A jury may disagree with Newell's theory. The Court, however, is unwilling to take that decision out of the jury's hands. *See, e.g., Depuy Spine*, 469 F.3d at 1020 (rejecting defendant's argument of claim vitiation because, "we find that a question of fact exists as to whether the difference between the 'spherical-shaped' limitation and the alleged equivalent is substantial."). .

This is a close case; made closer by the fact that Vision's brief was particularly well written. But, ultimately the Court finds that Newell's theory of infringement does not vitiate the claim limitations.[6] The Court denies Vision's motion for summary judgment as to Count II

## C. *Breach of the Settlement Agreement*

---

[6] Vision also contends Newell's theory of infringement vitiates the requirement that the longitudinal groove be formed by structures on the *side* wall. Specifically, Vision claims Newell should not be allowed to count the rear wall projection as forming a longitudinal groove. Newell responds that unlike the Ro-Mai prior art, Vision's products have a rear projection that encroaches on the side wall by extending outward "*beyond* the line of the sidewall," and aligning with the front projection and side wall projection to form the equivalent of a longitudinal groove. (Vision Response Brief at 10 citing Schultz affidavit). The Court reiterates that Newell's infringement claim is brought pursuant to the doctrine of equivalents. Vision's argument is more appropriate as a defense against a claim of literal infringement.

17

In 2005, Newell sued Vision for infringement of the '291 patent.[7] Subsequently, the parties entered into a settlement agreement stating:

> Vision covenants and agrees to not make, use, sell, ***advertise*** or distribute in the United States, or to import into the United States, a tilt latch product having a sidewall structure as shown in Attachment B (Prohibited Proposed Assemblies) during the term of this agreement

(Vision Mot. for Summary Judgment, Ex. 11) (emphasis added) Newell alleges Vision violated the Settlement Agreement by, *inter alia*, advertising a "prohibited" tilt latch on its website. Vision admits that images of a banned tilt latch appeared on its website. Vision, however, argues the images were uploaded by mistake and that it never sold any of the banned products. Luke Liang, Vision's corporate representative, had this to say during his deposition:

A:    … [T]hey put the wrong picture there.
Q:    Who's – who's 'they'?
A:    Well, the guy who uploaded it. And when I reviewed that, I – I overlooked it.

Q:    Who's the guy that uploaded this information?
A:    China did. They uploaded it…

(Liang Dep. at 128) Liang further testified: "This, as I explained, was an innocent mistake." (Liang Dep. at 133).

Newell has produced evidence that even after the execution of the Settlement Agreement, Vision's website contained images of product designs that were expressly prohibited by the Agreement. Vision, however, says it was not really "advertising" because: (1) it never *intended* to sell any of the products; and (2) the prohibited assembly appeared on the website by mistake. Whether Vision intended to sell these products (and was thus "advertising"), or whether the products appeared on the website due to human

---

[7] Newell sued Vision in the Northern District of Illinois; the case number is 05-C1244.

error is a question of fact for the jury to sort out. The Court denies Vision's motion for summary judgment as to Count I.

IT IS SO ORDERED.

_3/30/09_
Dated

The Honorable William J. Hibbler
United States District Court