

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NEWELL OPERATING COMPANY, ) <br> ) <br> Plaintiff and ) <br> Counterclaim-Defendant, ) <br> ) <br> v. ) <br> ) <br> VISION INDUSTRIES GROUP, INC., ) <br> ) <br> Defendant and ) <br> Counterclaim-Plaintiff ) <br> ) <br> v. ) <br> ) <br> STERN & COMPANY, ) <br> ) <br> Counterclaim-Defendant. ) | No. 07 C 2996 <br><br> The Honorable William J. Hibbler |

### MEMORANDUM OPINION AND ORDER

On March 30, 2009, this Court denied a motion for summary judgment by Vision Industries Group, Inc. Vision moves for reconsideration of that decision, arguing that the Court overlooked arguments that it set forth in its original motion. For the reasons set forth below, the Court denies Vision's motion.

### *BACKGROUND*[1]

Newell Operating Company, through its business entity (Ashland Hardware Systems), designs, manufactures, and sells products for window assemblies, including tilt latches. Vision competes with Newell in the window assembly and tilt latch production market.

---

[1] For a more complete statement of the facts of this case, including diagrams, see the Court's previous decision in *Newell Operating Co. v. Vision Indus. Group, Inc.*, No. 07 C 2996, 2009 WL 890028, *1-*3 (N.D. Ill. Mar. 30, 2009).

1

Newell is the sole owner of U.S. Patent No. 5,139,291 entitled "Flush Mount Tilt Latch For A Sash Window And Method" ("the '291 patent" or "the patent"). The patent discloses a tilt latch that slides into the top sash of a window assembly. A tilt latch "is used in windows in order to allow a user to unhook the bottom half of a standard window and tilt the window inward." *Ashland Prods. Inc. v. MEC Techs., Inc.*, No. 96 C 4436, 1999 WL 184652, *1 (N.D. Ill. March 24, 1999).

The '291 patents states that the inventor developed the tilt latch to improve upon existing prior art, specifically, a latch sold by Ro-Mai Industries. ('291 Patent, Col. 1, lns. 67-68). The Ro-Mai latch was installed into the top of a window sash by pushing downwardly until short flared tabs snapped into place below the sash's header rail into order to prevent the latch from disengaging from the sash. ('291 Patent, Col. 1, lns. 59-63). The '291 patent, however, criticizes the Ro-Mai prior art for tending to disengage despite these tabs. ('291 Patent, Col. 1, lns. 59-63). The patent discloses a latch which is installed into the top of the sash by sliding it in from the side along a "longitudinal groove" formed by a side rail and the latch's housing cover, which cooperatively receive the header rail of the sash. ('291 Patent, Col. 1, lns. 64-68).

Newell has sued for infringement of the '291 patent prior to this case. In two cases, the court held pre-trial "*Markman* hearings" to construe the patent's meaning. *Ashland Prods. v. Ro-Mai Indus.,Inc.*, No. 97 C 5332, 1999 WL 639183 (N.D. Ill. Aug. 17, 1999); *MEC*, 1999 WL 184652; *see Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 1165 S. Ct. 1384, 134 L. Ed. 2d 577 (1996). The rulings resulting from those hearings gave the term "longitudinal groove" more definition. The court in *MEC* determined that the groove did not need to be continuous in order to fall within the ambit of the patent. *MEC*, 1999 WL 184652, at *3. Instead, the court held that the groove could be created by the

housing cover on one side and "one or more projections which extend substantially along the length of the side wall" on the other. *Id.* at *5 (citations omitted). The court in *Ro-Mai* noted that the "purpose of the groove is to better engage the header rail; the implicit assumption is that the longer the groove, the more securely the latch will be retained." *Ro-Mai*, 1999 WL 639183, at *6. In order to determine how long the groove must be in order to fall within the reach of the patent, the court held that "it is the projections themselves (and not the gaps between them) that literally create the groove, and that must extend substantially along the length of the side wall," *id.* at *7, and thus, "any gaps between projections shall be disregarded in determining the length that the projections extend," *id.* at *10.

Newell sued Vision for infringement of the '291 patent in 2005. The parties entered into a settlement agreement which, among other things, prohibits Vision from advertising or selling certain products. Newell has now sued Vision a second time, alleging that Vision infringed the '291 patent and advertised and sold products in violation of the settlement agreement. On March 30, 2009, this Court denied Vision's motion for summary judgment on both counts. Vision now moves the Court to reconsider its decision.

## DISCUSSION

### I. Standard of review

The parties assume that the proper standard to be applied to Vision's present motion is whether the Court made a "manifest error of law or fact" in denying Vision's motion for summary judgment. *See Hicks v. Midwest Transit, Inc.*, 531 F.3d 467, 474 (7th Cir. 2008). They agree that the Court should only grant Vision's motion if it made an error of apprehension, not of reasoning. *See Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990). While these are the generally accepted standards for deciding motions for

3

reconsideration, the Court is not convinced that the present motion was properly titled. The standards cited above are usually applied in cases where a court *grants* summary judgment, and the losing party requests reconsideration under Federal Rule of Civil Procedure 60(b) or 54(b). *See, e.g., Hicks*, 531 F.3d at 474; *Bank of Waunakee*, 906 F.2d at 1188. Here, the Court denied summary judgment. "The denial of summary judgment is not a final judgment; rather, it is an interlocutory order." *Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995). Thus, "the district court may, in its discretion, allow a party to renew a previously denied summary judgment motion or file successive motions, particularly if good reasons exist." *Id.*

For this reason, the Court may deem it proper to convert Vision's motion for reconsideration into a second motion for summary judgment. *See Anderson v. Isham*, No. 97-1422, 210 F.3d 374, 2000 WL 340778, *2 (7th Cir. 2000) (unpublished disposition affirming district court's decision to convert a motion for reconsideration of a denial of summary judgment into a second motion for summary judgment). However, a "renewed or successive motion for summary judgment is appropriate especially if one of the following grounds exists: (1) an intervening change in controlling law; (2) the availability of new evidence or an expanded factual record; and (3) need to correct a clear error or prevent manifest injustice." *Whitford*, 63 F.3d at 530 (internal quotation marks omitted). Thus, Vision may need to make a similar showing of error, nonetheless. Moreover, for the reasons set forth below, the Court denies Vision's motion even when holding it to the standard of a normal summary judgment motion.

## II. Analysis

### A. Patent Infringement

Vision argues that the Court overlooked its argument that the doctrine of equivalents cannot be applied here because to do so would be to expand the claim scope of the '291 patent to

4

encompass the Ro-Mai prior art. The Court did not overlook Vision's argument, but in response to Vision's motion, the Court provides the following more thorough analysis.

Newell concedes that Vision's accused products fall outside the literal terms of the '291 patent and bases its theory of liability on the doctrine of equivalents. The doctrine of equivalents provides for liability when an accused product "contains elements identical *or equivalent* to each claimed element of the patented invention." *Warner-Jenkinson v. Hilton Davis Chemical Co.*, 520 U.S. 17, 40, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997). In order to show that the doctrine of equivalents applies, Newell must show that each accused product "performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Crown Packaging Tech., Inc., v. Rexam Bev. Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).

Here, Vision argues that as a matter of law, Newell is unable to make such a showing with regard to the longitudinal groove claim limitation in the '291 patent. Vision points to the principle that a finding of equivalent infringement cannot expand claim scope to encompass prior art. *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1368 (Fed. Cir. 1999). Vision argues that to find that the accused products possess the equivalent of the patented longitudinal groove would be to expand the '291 patent's claim scope to encompass the Ro-Mai prior art because the side and rear projections on the accused products are shorter than those in the prior art in both relative and absolute terms.

First of all, the Court is not convinced that Vision's method for measuring the length of its projections is the proper method. Vision argues that the Court should only consider the points at which the projections make contact with the header rail once the latch is inserted into the sash, despite the fact that its projections are actually substantially longer than these points of contact.

5

Taking the full length of the projections into account, the accused projections constitute over 15% of the side wall, which is more than the tab in the Ro-Mai prior art.

However, even accepting Vision's method for the moment, Vision's logic is flawed. In order to address this flaw, the Court begins by noting that Vision's argument does convince the Court that two propositions are true. First, under a *literal* construction of the patent (such as those achieved through the *Markman* hearings) the placement of multiple projections at the far ends of a latch is not sufficient to create a longitudinal groove if those projections are not collectively longer than the tab in the Ro-Mai prior art. *Ro-Mai*, 1999 WL 639183, at *6. Second, if a latch has just one projection, similar to the tab in the Ro-Mai prior art, then the doctrine of equivalents cannot be used to bring that latch within the scope of the claims unless the tab is significantly longer than the Ro-Mai tab. That would be a clear violation of the principle against encompassing the prior art.

However, the fact that these two propositions are true does not preclude the theory set forth by Newell here: that the doctrine of equivalents can be used to encompass a latch which has multiple projections spread out across the length of the latch, even if the collective length of those projections is not more than that of the Ro-Mai prior art. Unlike in *Ro-Mai* and *MEC*, the Court is presently addressing a theory based on the doctrine of equivalents, and is therefore not constrained by the fact that the placement of the tabs at the far ends of the latch is not enough to bring projections which are shorter than the Ro-Mai tab within a literal construction of the patent. At the same time, because of the fact that the accused products have a feature which makes them different from the Ro-Mai prior art, namely projections spaced a substantial length apart from one another along the length of the latch, the Court is not constrained by the length of the tab in the Ro-Mai prior art.

Vision nonetheless argues that the *Markman* rulings restrict this Court in the present case because in both hearings the court found that the "benefits of the patented design can be gained from a non-continuous wall, as long as the walls are significantly longer than the flare tabs of the prior art Ro-Mai design." *MEC*, 1999 WL 184652, at *4; *Ro-Mai*, 1999 WL 639183, at *3, *7. Vision argues that this statement limits the Court in its analysis under the doctrine of equivalents because the doctrine "exists solely for the equitable purpose of preventing an infringer from stealing the benefit of an invention." *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 805 F.2d 1558, 1572 (Fed. Cir. 1986) (internal quotations marks and brackets omitted). Because the statements in the *Markman* rulings contain the phrase "as long as," they do purport to limit the construction of the patent. However, the Court once again notes, as it did in its previous opinion, *Newell*, 2009 WL 890028, *7, that the *Markman* hearings concerned literal constructions of the patent. Thus, while the courts in those cases may have used language concerning the benefits of the patent, they were ultimately considering whether the accused products at issue were close enough to the preferred embodiment of the patented latch to fall within the literal scope of the '291 patent. While the statements made in those cases may have some persuasive value when it comes to applying the doctrine of equivalents in this case, the Court is not persuaded that the accused products are, as a matter of law, outside the reach of the doctrine.

Thus, the Court did not err in finding that there is a genuine issue as to whether the projections on the accused products are long enough to constitute an equivalent to the patented longitudinal groove. When there is a genuine issue of material fact, summary judgment is not appropriate. Fed. R. Civ. P. 56(c). The Court reaffirms its ruling and denies Vision's motion as to the patent infringement count.

7

## B. Breach of the settlement agreement

Vision also believes the Court overlooked its arguments with regard to Newell's claim that it breached the settlement agreement between the parties. Vision argues that there are two separate classes of products to be considered here – those that it merely advertised, but never sold, and those that it did sell.

### 1. Products advertised, but not sold

Vision argues that the Court erred in denying summary judgment as to the products which it advertised, but never sold. Vision notes that the Court did not address Vision's argument that Newell could not possibly prove damages related to this aspect of the alleged breach. The Court did not address this argument in its previous opinion, but dismisses it here.[2] The Court will not enter judgment on a claim when it will be difficult, but not impossible, to prove damages. The Court finds that to be the case here. Vision does not provide affidavits, deposition testimony, or exhibits in support of its argument. On the other hand, Newell provides documentary support in the form of an email from Vision to a potential customer which supports its contention that Vision marketed the products it did sell with reference back to the design which Vision admittedly advertised. In the email a Vision sales representative claims that the new design is a "small variation" from the previous design. If Vision was successful in selling this design in part because of advertising that violated the settlement agreement, then Newell may be able to prove damages. The Court will not grant Vision summary judgment merely because this will be a difficult task for Newell.

---

[2] The Court notes that Vision did not raise this argument until its reply brief, and it has therefore not been fully briefed. Vision argues that it was justified in raising the argument in reply because it was not until Newell's response brief that Newell raised the argument that Vision violated the agreement simply by advertising products. The question of whether Vision was put on notice regarding this argument by the First Amended Complaint is a close one, but the Court need not address it here, as Vision's argument fails on its merits.

8

### 2. Products sold

Finally, Vision argues that the Court failed to address its argument regarding products that Vision did sell. In the settlement agreement, Vision agreed, among other things, not to sell "a tilt latch product having a sidewall structure as shown in ATTACHMENT B (Prohibited Proposed Assemblies) during the term of this agreement." Vision asserts that because the products it sold did not have precisely the same side wall structures as those pictured in the attachment, it did not breach the settlement agreement.

The Court finds that the language in the agreement is ambiguous, and that as a result, it is unclear whether Vision breached the agreement by selling the latches it admits to selling. While Vision sets forth a reasonable interpretation of the language quoted above, it is not the only reasonable interpretation. The phrase "as shown" could be interpreted to mean precisely the sidewall structures shown, or to mean that the sidewall structures shown represent examples of those that are prohibited. This sort of ambiguity was not present in *Panduit Corp. v. Hellermanntyton Corp.*, 451 F.3d 819 (Fed. Cir. 2006), the only case cited by Vision in support of its argument. In that case, the settlement agreement at issue expressly addressed a specific product by name and product number. *Id.* at 826. Thus, the Court found the language of the agreement to be unambiguous and refused to read it to prohibit sale of similar products. *Id.* at 827. Given the ambiguity of the provision in this case, the Court cannot determine the proper construction on the record currently before it. The Court will decide the issue after all of the relevant evidence has been presented.

## *CONCLUSION*

For the above reasons, the Court denies Vision's motion for reconsideration.

IT IS SO ORDERED.

5/26/09
Dated

Hon. William J. Hibbler
United States District Court